*STATE EX REL. PERRY GIBSON v. BOARD OF EDUCATION OF THE VILLAGE OF OXFORD.

1. SEPARATE SCHOOLS FOR COLORED CHILDREN.

Since the passage of the act of February 22, 1887 (84 O. L., 34), repeating sec. 4008 Rev. Stat., a board of education of this state, no longer has the right to organize separate schools for colored children, and legally require such children who are entitled to the benefits of the public schools of a district, and who desire to avail themselves of such right, to do so, *only* in a school, organized, maintained or set apart by such board, *solely* for the education of the colored children of such district.

*The judgment in this case was affirmed by the Supreme Court. See opinion, 45 O. S., 555.

2. AUTHORITY CONFERRED UPON BOARDS OF EDUCATION BY SECTIONS 4008 AND 4013.

Said sec. 4008, while in force, did *expressly* confer such power upon boards of education, and sec. 4013, was not intended to, and did not at the time of its enactment give the *same* authority. And the repeal of sec. 4008 did not so operate, as to give to sec. 4013, any different meaning or effect than it had before such repeal.

3. REPEAL OF SECTION 4008, REVISED STATUTES.

The fact that prior to the repeal of sec. 4008, a board of education had, under its provisions, established a separate school for colored children, does not authorize it to continue the same after such repeal, and to require the colored children, against their will, to attend the same, and unless they do, to be deprived of the benefit of the public schools of the district. The legislature as to the conduct and management of the public schools, and the powers of the board of education is supreme. The law repealing sec. 4008, was not one affecting vested rights, or in any way impairing the obligation of contracts.

MANDAMUS.

SMITH, C. J.

An alternative writ of mandamus having heretofore been allowed in this case, on the showing made upon the petition, on the final hearing on the pleadings and evidence, we find the following facts to be clearly shown.

*First*—That the children of the relator, a colored man, are entitled to the benefits of the public schools of the village of Oxford ; and that for some time after the commencement of the present school year (say Sept. 1, 1887), they, with other colored children of the district, who presented themselves for that purpose, were received as scholars, and were instructed in the public school of the village, conducted in the new school building, which shortly before that time had been erected and completed, and which had been intended by the board of education for the exclusive use of the white children of the district (and other white children who might be admitted thereto), except as hereinafter stated.

*Second*—After the children of such relator, and the other colored children, had attended, such school for about two weeks, they were required by those having the superintendence of such school and of the other public schools of the village, under and by virtue of a resolution passed by the board of education thereof, to cease their attendance upon the same ; and they were notified that if they desired to avail themselves of the benefit of the public schools of such district, that they must attend the one held and conducted in the building formerly used exclusively for the colored children thereof, and which was one of the public schools of such village, and which, by said resolution and order of the board of education, was thereafter to be used exclusively for the colored children of the village, while the other building was to be used for the education of the white children only—except that when a colored child was sufficiently advanced to enter the high school department taught therein, it might be admitted to such high school with the white children.

*Third*—The building thus set apart as a school for the colored children, and which had been so used for several years prior to this time, was an old one, containing two rooms. It was not so modern or stylish in its appearance or appointments, as the other, but was comfortable and convenient. The school therein was conducted by two excellent white teachers. And while it had not so many rooms or teachers employed therein, as the other building, the same branches were taught, and the grades established therein (below the high school department), were the same.

*Fourth*—The new building alone, was not large enough to contain, comfortably, all of the children, white and colored, in the district. The two together are large enough to do this. They stood about a third of a mile apart.

*Fifth*—The board of education in passing this resolution, and in making this order, acting in good faith, and believing that it would best promote the interest of education in such district, thus to assign the white youth thereof to the large building, and all the colored youth thereof (with the exception before stated), to the other building.

On this state of fact so found, the question is fairly presented, whether such establishment of separate schools for white and for colored children is warranted, as the law now stands.

There can be no question but that under the provisions of sec. 4008, Rev. Stat., while it continued in force, the board of education *was* expressly authorized to do this. But on February 21, 1887, (84 O. L., 34,) the legislature passed an act repealing this section and also secs. 6987 and 6988, which latter sections made it unlawful for white persons and those having a visible admixture of African blood, to intermarry with each other, and also made it unlawful for a probate judge of this state, knowingly to issue a license for such marriage, or for any person to solemnize the same. The repeal of these last two sections is only material here, as it may tend to throw light on the purpose of the legislature in the repeal of sec. 4008.

The question for consideration is, what is the effect of such repeal ? Does the board of education now have the right, precisely as it had before, to organize or continue separate schools for colored children, and require such children to attend them, or be wholly deprived

of the benefits of the public schools ; or was it the intention of the legislature, by its repeal, to take away such right entirely?

It is claimed that the prior legislation of the state on this subject, throws light upon the intention of the legislature in this action, and tends to show that it was the purpose in this repeal to so legislate, that there shall no longer be a placing of the pupils in the public schools of the state, into separate schools, on the sole ground of the difference in the color of their skins.

Before the year 1848, it appears that the only persons entitled to the privileges of the public schools were the *white* youth. The act of February 24, 1848, for the first time, made any provision whatever for the education of the colored children. It provided for the levy of a tax upon the property of colored persons, for the support of separate schools for colored children, if any objection was made to their admission to the schools for the white children. But this measure being practically inoperative, on account of the trifling sum thus raised—wholly inadequate for the purpose—on March 14, 1853, a law was passed requiring boards of education to organize schools for the colored children, and giving to the support thereof of the common school fund, that proportion which the number of the colored children bore to the whole number of children in the district, and subsequently it was simply enacted that such schools be organized, without any such provision as to the division of the school funds.

By the act of May 11, 1878, (75 O. L. 513, sec. 50,) and which is substantially sec. 4008 of the revision of 1880, a *discretion* was conferred upon boards of education to organize separate schools for colored children, if in their judgment it would be for the advantage of the district to do so. They were not *bound* to do this. And if they did not, as the colored children, by other provisions of the statutes, were entitled to the benefit of the public schools, it would follow that they could legally claim admission thereto, with the white children of the district. And so the matter stood until the repeal of the section in February last.

It is evident, we think, from this very hasty statement of the legislation of the state on this subject, that there has been a gradual, but steady attempt upon the part of the law makers to give to the colored children, the full benefit of the public schools, and to some extent at least, to have the distinction on account of color, so far as the law is concerned, done away with. And by the act under consideration, this seems to have been fully accomplished, for so far as we know, there is now no law upon the statute book, which makes any distinction between white and colored people. Unless then there is some *law*, which gives to the boards of,education the right to make a distinction of this kind, it would seem that it would be contrary to the spirit of our laws and unauthorized for them to do so.

The claim of the counsel for the defendants is, that there *is* such a statute—one which clearly authorizes the action taken by the board in this case—and if there is, that ends the controversy. Sec. 4013, Rev. Stat. is the one which it is urged has this effect.

It is true that the language of this section, and of others which might be referred to, does confer great authority and discretion upon the boards of education, in the general conduct and management of the public schools in their respective districts. And if we looked alone at the provisions of sec. 4013, and without any consideration of those contained in sec. 4008 (which substantially, as they now appear in the revision, have both been in force for years), it might seem from the large authority and discretion given by it, to the boards, as to the assignment of scholars in their districts to the different schools, that they might assign all the colored children to one, and the white children to another, if in their judgment it would best promote the cause of education to do so.

But looking at the two sections together, and to the general policy disclosed by the legislation, we think there are strong reasons to believe that such power was never intended to be conferred by sec. 4013. Sec. 4008, passed at the same time, *does* do this in express terms, and by no fair principle of interpretation, known to us, can it be held, that where a power is expressly conferred by one section, and another section of the same law, confers other general powers, that this last section can be held to confer the same special authority as the other section does. Its inclusion in the one, would seem to be its exclusion from the other. And when the legislature see proper to repeal the section, expressly granting the power, leaving the other section conferring other powers to stand, we know of no principle of law, or of the interpretation of statutes, which would authorize us to hold, that sec. 4013 *now* confers any authority which it did *not* before. And what could have been the purpose of the legislature in repealing this section, if it was *not* to take away the power thereby conferred? Can it be supposed that it would have been done, if the effect of it was to leave in force a section under which the same action could have been had, though the power to do so, was much less clearly conferred by it? On the construction claimed by the counsel for the defendants, the repeal would seem to be entirely without purpose. On the contrary, we think, the legislature clearly intended to take away from the boards the right to make any such distinction between the white and colored children.

It is apparent also in our view, from the whole history of the legislation on this subject, to which we have before briefly referred, that the only power or discretion given to boards of education, when dealing with this delicate and difficult subject, is what *was expressly* given to them by statute, and in several instances no discretion whatever as to this was conferred upon them, but the law simply declared what should be done. Thus, in the first place, colored children were not entitled to admission to the schools at all, and the board

had no right to receive them.   *Second*—They *must* establish separate schools for the colored children.   *Third*—The discretion was next *expressly* conferred upon them to do so, if in their judgment the interest of education in the district required it.   *Fourth*—The section expressly conferring this discretion was repealed.  It is thus shown, we think, that the legislature, and doubtless for good reasons, has ever seen proper to deal with this subject in a different manner than with others simply relating to the general conduct and management of the public schools, and that all the right a board of education has now, or ever had, to deal differently with white and colored children as such, must be derived from an express provision of the law.

We have said that under sec. 4013, and other sections of the law, large discretion as to the general conduct of the schools is conferred upon the board, and as to matters concerning which they have authority or discretion, it is not lightly or without strong reason to be interfered with.  But unquestionably, this discretion when conferred, is a *limited*, and not an absolute one.  It must surely be exercised in a manner that would not be in conflict with the spirit of our institutions, or the general policy of our legislation.   What court, for instance, would hold that the action of a board of education, claiming to act under sec. 4013, assigning all the children of rich parents to one school, and those of poor parents to another, or making any other like arbitrary or artificial distinction between the pupils, could be upheld, even if it appeared that on account of the prejudices existing, the board was of the opinion that it would be to the advantage of the cause of education to do so? And as the legislature has now repealed the last acts upon the statute book, making any distinction between the legal rights of the white and the colored races, it would seem that after it had thus fixed and declared what the policy of the state on this subject is, 'that it is hardly within the right or province of a local board of any kind, which receives its whole power from the same legislature, to set up and establish a rule and standard of attendance upon the public schools, apparently in direct conflict with the policy of the state.

With the expediency or propriety of this action of the legislature, we as a court have nothing to do.   Our province is to declare the law as we understand it.   And it seems quite clear to us, that the object and purpose of the repealing act referred to, and its effect, are as we have before indicated, and that the fact (as we think it *is* the fact), that the action of the legislature has been accepted and considered as having this effect, not only by eminent lawyers and jurists, but by the great majority of the boards of education in the state, and by the great mass of the people thereof, as shown by the practice under it, and the acquiescence in such practice, is entitled to much consideration on the question of the intent of the legislature in its passage.   It is hardly possible in a matter involving so much feeling and so many prejudices, that this interpretation would have been so generally put upon the action of the legislature, if it was not the one which appeared plain to the common understanding of the people of the state.

The fact that prior to the repeal of this sec. 4008, the board had acted under it, and had established a separate school for colored children, does not, in our opinion, authorize it to continue the same after such repeal, and to require the colored children, against their will, to attend the same, or be deprived of the advantages of the public schools of the district.   The legislature, as to the conduct and management of such schools, and the powers of the board of education, is supreme.   The law repealing sec. 4008, was not one affecting vested rights, or in any way impairing the obligation of contracts.

We are of the opinion, then, that the relator is entitled to a peremptory writ as prayed for.

JUDGE SWING dissents from the judgment, and may hereafter, if desired, give his reasons therefor.

Messrs. Morey, Andrews & Morey, for relator.
Messrs. Thomas Milliken, A. F. Hume and Palmer W. Smith, for board of education.